THE TRUSTEES OF THE FREEHOLDERS AND COMMONALTY OF THE TOWN OF EAST HAMPTON, Appellants, v. JOSIAH KIRK, Respondent.

Plaintiffs having title to land bounded by the waters of a bay at ordinary high-water mark made an allotment, under which defendant claimed, bounded westerly by " the cliff." At the time of the allotment there was a strip of land between the cliff and high-water mark. In an action of ejectment, *held*, that this strip was not embraced in the allotment; but that the boundary by the cliff was not a shifting one so as to entitle plaintiffs to make reprisals out of the allotted lands for land lost by the advance of the sea; and that, as between them and the grantees, the site of the cliff at the time of the allotment continued to be the western boundary, and if the strip then intervening between it and high-water mark and a portion of the cliff had subsequently been worn away by the action of the sea, so that the present high-water mark was within the boundaries of the allotted land, plaintiffs had no title.

Defendant also claimed by adverse possession. It appeared that fences on the sides of defendant's premises, extending across the strip in question to or near low-water mark, had been maintained by him and his grantors for more than twenty years, those portions across the beach being taken away in winter to prevent their being carried away by the ice and tides; there was no fence along the cliff, the land on that side being open to the sea. *Held*, that the evidence was sufficient to authorize the submission to the jury of the question as to whether there was a substantial inclosure within the meaning of the statute.

Also *held*, that the fact that defendant and his predecessors in title had gathered sea-weed from the premises while not alone evidence of adverse possession, was such evidence taken in connection with the fact that

they claimed to prevent other freeholders of the town from gathering, and that they did so under claim of exclusive right as owners, which claim was known to plaintiffs.

It appeared that R., a former owner of defendant's land, brought an action for trespass against one who had gathered sea-weed upon the beach. R. discontinued the action under an agreement with the town and agreed not to sue again. *Held*, that this did not entitle plaintiffs to a charge to the jury that R. thereby relinquished his adverse possession; that it was at most evidence bearing upon that question for the consideration of the jury.

(Argued December 20, 1880; decided March 1, 1881.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made September 10, 1878, which affirmed a judgment in favor of defendants, entered upon a verdict and affirmed an order denying a motion for a new trial.

This was an action to recover possession of a strip of land called " the beach," lying along the front, upon the bay, of defendant's land, in the town of East Hampton, Suffolk county, and between high-water mark and the " cliff" or upland.

The case is reported upon a former appeal in 68 N. Y. 459.

Plaintiffs claimed title under what is known as "Dongan's Patent," issued by Governor Dongan in 1686 to plaintiffs in trust for the use of the inhabitants of the town. The lands were allotted to various inhabitants of the town, being bounded " westerly by ye cleft." Plaintiff claimed under a deed executed in 1810, which bounded the land on the bay side "by the cleft or beach," and through various mesne conveyances wherein the boundary was similar, in some the word being " cliff," in others " cleft."

The further material facts appear in the opinion.

*J. Lawrence Smith* for appellants. The cliff which formed the north-west boundary of the allotment in 1736 was a movable boundary, if its location has been materially changed since the allotment, so that the north-west boundary of the lots is the site of the cliff as it is now located. (*Kind* v. *Lord Yar-*

*borough*, 3 Barn. & Cress. 91; 6 Cow. 536, note *a;* Hale's De Jure Maris, chap. 1; 3 Kent's Com. 428, note *a;* 1 Gill & Johns. 249; *New Orleans* v. *The United States*, 10 Pet. 662; *Municipality* v. *Orleans*, 18 La. 122, 436; *Phillips* v. *Rhodes*, 7 Pick. 322; Angell on Water-Courses, §§ 53, 54a and notes; 2 Justinian's Institutes, tit. 1, §§ 20, 21; *Matter of Hull & Selby R. R. Co.*, 5 Mees. & Wels. 327.) To make fences effective as evidence of adverse possession they must be made to guard the premises against escape from within or encroachment without. (*Jackson* v. *Schoonmaker*, 2 Johns. 230, 234.) The obvious and undoubted comity of permitting fences to be maintained, under the circumstances, is a complete bar to the pretense that the fence was ever put there to the exclusion of anybody using or traveling on the beach. (*Flora* v. *Carbean*, 38 N. Y. 111, 116; *White* v. *Spencer*, 14 id. 247; *Calvin* v. *Burnett*, 17 Wend. 564.) The taking of sea-weed from the beach by the defendant and his grantors could not be an act of adverse possession, because they had a perfect right to do it as citizens and commoners of East Hampton. (*Trustees of East Hampton* v. *Kirk*, 68 N. Y. 459.)

*E. A. Carpenter* for respondent. The title to the property in question is not and never was in the plaintiffs. (R. S., part 2, chap. 1, tit. 1, art. 2, § 46.) If the cliff was the westerly or north-westerly boundary of the allotment in 1736, it was a fixed not a movable boundary, and the defendant is entitled to go exactly where the cliff stood at the time of the allotment and the date of his deed. (2 Bl. Com. 262; *Matter of the Hull & Selby Ry. Co.*, 5 Mees. & Wels. 237; *Rex* v. *Yarborough*, 3 Barn. & Cress. 91; Angell on Tide-waters, 249; *Souset* v. *Shepherd*, 4 Wall. 502; *Barrett* v. *New Orleans*, 13 La. Ann. 105.)

Andrews, J. In the allotment by the trustees of the freeholders and commonalty of the town of East Hampton of the common lands of the town, made in 1736, the Mulford tract, now owned by the defendant, was described as bounded westerly

by the cliff. It is assumed by both parties that the title of the freeholders under the Dongan patent extended to ordinary high-water mark. When the allotment was made, there was a strip of land between the cliff and high-water mark several rods in width. This strip was not embraced in the allotment, and was consequently reserved by the freeholders as a part of the common lands. The plaintiffs as owners held it subject to the incidents which attend the title of riparian owners. They would be entitled to whatever should be gained from the sea by alluvion or dereliction, and their title was liable to be lost by the advance of high-water mark, so as to bring the strip reserved within the ebb and flow of the tide. (2 Bl. Com. 262; *In re Hull and Selby Ry.*, 5 Mees. & Wels. 327.) There was the possibility of gain or loss, to which all riparian owners are subject.

The defendant introduced evidence tending to show that since the allotment the cliff had been worn away by the action of the sea, and that the space between the cliff as it now exists and present high-water mark was, at the time of the allotment, within the boundaries of the allotted land. If this fact is established, it necessarily follows that the strip reserved by the freeholders from the allotment has been swallowed up by the sea, and the plaintiffs have no title to the *locus in quo*, unless, as they claim, their boundary was carried eastward *pari passu* with the advance of the sea. It is insisted, in support of this position, that the cliff, under the description in the allotment, was a movable boundary. There may be a movable freehold, as when the crown grants to a subject the soil between high and low-water mark. In that case the grant would be construed according to the presumed intention to convey the shore, wherever, from time to time, it might be; and the same construction has been put upon a grant by a subject in whom the title to the shore was vested. (*Scratton* v. *Brown*, 4 Barn. & Cress. 485.) So also where an easement is granted to take sea-weed from the beach of the grantor, the right would be held ordinarily to follow the shifting of the beach, occasioned by the imperceptible encroachment or reliction of the sea.

(*Phillips* v. *Rhodes*, 7 Metc. 322.) But the allotted lands were not bounded by the shore, but by the cliff. The cliff was a visible monument; and there is nothing in the attending circumstances to show that the parties to the allotment apprehended that the shore line would be materially changed. The freeholders may have intended, by bounding the allotted lands by the cliff, to secure to the public in perpetuity the right of access to the sea, but there is nothing to indicate that this was intended to be accomplished in any other way than by reserving from the grant the strip then lying between the cliff and the shore. It would, we think, be an unwarrantable interpretation of the transaction to hold that the cliff mentioned in the allotment was a shifting boundary, so as to entitle the plaintiffs to make reprisal for the land lost by the advance of the sea out of the allotted lands. The owners of the lands could gain nothing by accretion. They might lose by the advance of the shore line beyond the point where the cliff was originally located. But as between them and the grantor, the site of the cliff at the time of the allotment continued, we think, to be the westerly boundary of their lands. The trial judge charged substantially in accordance with this view, and the exception to the charge upon this point is not tenable.

It was a controverted question whether the shore line had materially changed since the allotment; and upon this point much evidence was given by both parties. If it had not changed, then the plaintiffs made out a record title to the strip in controversy and were entitled to recover, unless the defendant established a title by adverse possession. The most important question now presented upon the point of adverse possession arises upon the plaintiffs' exception to the submission by the court to the jury of the question whether there had been a substantial inclosure of the premises by the defendant or his grantors, for more than twenty years prior to the commencement of the action. It appeared that fences on the lateral boundaries of the defendant's premises, extending across the strip in question into

the water to or near low-water mark, had been maintained by the defendant and his grantors for much longer than twenty years. The fences across the beach, however, were taken away in the winter, to prevent them from being carried away by the ice and the tides. The posts, as may be inferred from the evidence, were left standing, and in the spring the fences were replaced and remained until taken away again in the fall. There were bars in the fence. There was no fence in front of the cliff, but that side of the defendant's land was open to the sea. The cliff, to some extent, operated as a barrier on that side for the protection of the defendant's land. One of the alternative requirements of the statute to constitute an adverse possession is, that the land of which title by adverse possession is claimed shall have been protected by a substantial inclosure. (Code, §§ 82, 83.) In *Jackson* v. *Schoonmaker* (2 Johns. 229) it was held that a possession fence, which was made by trees felled and lapping one upon another, did not constitute a sufficient adverse possession to toll the right of entry of the true owner. The court said there must be a real and substantial inclosure, an actual occupancy, a *possessio pedis*, which is definite, positive and notorious, to constitute an adverse possession, when that is the only defense, and is to countervail a legal title. The object of the statute defining the acts essential to constitute an adverse possession is, that the real owner may, by unequivocal acts of the disseizor, have notice of the hostile claim and be thereby called upon to assert his legal title. In this case there was no actual inclosure by fences of the land in question. But this is not indispensable in every case. In *Jackson* v. *Halstead* (5 Cow. 216) title to land fronting on the Delaware river was claimed by adverse possession. Fences had been erected, extending to a point about a rod from the river, leaving some of the disputed ground uninclosed. But it was proved that the fence at this place was as near the river as the wash of the floods and the make of the ground would permit. This was held to be a sufficient inclosure. Woodworth, J., said that it would be too strict to require the

fence to be placed on the very margin of the river, where it would be liable to be swept away by the rise of water, and not within the reason of the rule defining what shall constitute an adverse possession. The learned judge further said that a river or mountain, or a ledge of rocks, on one side, forming a natural barrier, the other sides being inclosed, would, with claim of title, constitute an adverse possession. (See, also, *Becker* v. *Van Valkenburgh*, 29 Barb. 319.)

The requirement that the premises shall be protected by a substantial inclosure, if construed to require a continuous, uninterrupted inclosure for twenty years, would in many cases make it impossible to acquire title by adverse possession founded upon that provision. Upon such a construction, if fences were carried away by floods or destroyed by fire, or taken down in the winter for the accommodation of travel, the adverse possession would cease, although they were restored as soon as circumstances permitted. It is well understood that the bottom lands on some parts of the Mohawk river are annually overflowed, and fences are removed to prevent them from being carried away by the flood. It cannot, we think, be claimed that the temporary removal of fences for this purpose defeats an adverse possession, under the provision of the statute in respect to inclosure. In this case the land was left uninclosed on the side toward the sea. The sea was a natural barrier, as much so as a mountain or a river or a ledge of rocks; and the sea, with the lateral fences when maintained, constituted, we think, a substantial inclosure, within the meaning of the statute. The removal of the fences during the winter was to protect them from being swept away by the ice and tides. If they had not been removed, but had been left to be carried away each winter by the sea, the defendant could, we think, have replaced them in the spring, and would not have lost his right under the statute. By the voluntary removal of the fences he simply anticipated the action of the elements; and having restored them when the danger was passed, and maintained them during the season when the use of the beach for taking sea-weed was practicable, the purpose of notice, upon which the

statute proceeds, was met. The statute is declaratory of the previous law as established in this State, and the prior decisions are proper guides to its interpretation. For these reasons we are of opinion that the court properly submitted to the jury the question whether there was a substantial inclosure of the disputed premises by the defendant and his grantors.

The court properly refused to charge that no act of taking sea-weed from the premises by the defendant or his grantors was evidence of adverse possession. It was evidence in connection with the other facts, one of which was that they claimed to prevent other freeholders of East Hampton from taking, and took it not as commoners, but under claim of exclusive right as owners, which claim was known to the plaintiffs. Nor were the plaintiffs entitled to have the jury charged that Rogers, a former owner of defendant's premises, relinquished his adverse possession when he made the agreement with the town to discontinue the suit for trespass, commenced by him in 1853, against one who had gathered sea-weed upon the beach in question, and not to sue again. The act of Rogers in discontinuing the suit and making the agreement stated was, at most, evidence bearing upon the question of adverse possession, for the consideration of the jury.

We think no error was committed on the trial which is presented by any exception in the case, and that the judgment should therefore be affirmed.

All concur.

Judgment affirmed.